25 A.3d 1080

DEBRA ANN LOMBARDI, PLAINTIFF–RESPONDENT, v. CHRISTOPHER J. MASSO, JOHN M. TORRENCE, MTG PROPERTIES, LLC, JENNIFER LYNCH, AND PRUDENTIAL FOX & ROACH REALTORS, DEFENDANTS-APPELLANTS, AND JAMES GITHENS AND TARA CONSTRUCTION SERVICES, INC., DEFENDANTS.

Argued March 28, 2011—Decided August 26, 2011.

520

*Andrew J. Luca* argued the cause for appellants Jennifer Lynch and Prudential Fox & Roach Realtors (*Reger Rizzo & Darnall,* attorneys).

*Jeffrey P. Resnick* argued the cause for appellants Christopher J. Masso, John M. Torrence and MTG Properties, LLC (*Sherman, Silverstein, Kohl, Rose & Podolsky,* attorneys; *Mr. Resnick, Alan C. Milstein* and *Leily Schoenhaus,* on the brief).

*Daury I. Lamarche* argued the cause for respondent (*Walter T. Wolf,* attorney; *Mr. Lamarche* and *Mr. Wolf,* on the brief).

*Carl R. Woodward, III,* submitted a brief on behalf of *amicus curiae* Grow Company, Inc. (*Carella, Byrne, Cecchi, Olstein, Brody & Agnello,* attorneys; *Mr. Woodward* and *Dennis F. Gleason,* of counsel; *Mr. Woodward, Mr. Gleason* and *Vincenzo M. Mogavero,* on the brief).

Justice LONG delivered the opinion of the Court.

At the center of this appeal is a straightforward legal question: whether the trial judge properly granted summary judgment to the moving defendants in this action for breach of contract, fraud, misrepresentation, and conspiracy, arising out of a real estate transaction. Unfortunately, that legal question emerges out of what can best be characterized as a procedural swamp.

The trial judge granted summary judgment to five of the seven defendants in December 2006, and denied reconsideration in August 2007. At the same time, he conducted a proof hearing regarding a defaulted defendant. As a result of that hearing, the judge concluded, sua sponte, that the case was more complicated than he had realized, notified the dismissed defendants about his concerns, and scheduled a full hearing for November 2007. After that hearing, in which all parties participated, the judge concluded

that he had mistakenly granted summary judgment, pointing out that there were genuine issues of material fact, warranting a trial.

On interlocutory review, the Appellate Division reversed, without addressing the merits of the case. Instead, the panel ruled that the judge could not rely on what he had learned at the proof hearing to revisit the summary judgment order and reinstated that order.

After final judgment, plaintiff filed an appeal as of right challenging the propriety of the original grant of summary judgment. She did not challenge the interlocutory order, although defendants relied on it in defense of the appeal. In its opinion, the panel expressed the view, contrary to that of the interlocutory panel, that the trial judge was within his discretion to reconsider the summary judgment order for any reason in the interests of justice. The panel went on to declare, on the merits, that the summary judgment should not have been granted originally because of the existence of genuine issues of material fact.

Defendants filed a petition for certification in which they claim, essentially, that the interlocutory panel's reinstatement of the summary judgment order should have ended the inquiry. In particular, defendants argue that the interlocutory panel was correct in concluding that the trial judge could not reconsider the prior order based on what he heard at the proof hearing; that the law of the case doctrine prohibited the actions of the trial judge and the direct appeal panel; and that procedural irregularities in plaintiff's filing of the appeal should have barred its review. We granted the petition.

We now hold that the trial judge was well within his discretion in revisiting and vacating the interlocutory summary judgment order; that the law of the case doctrine does not apply to bar reconsideration in the circumstances presented; that plaintiff's appeal was properly considered, despite some missteps in the filing process; and that the Appellate Division correctly determined that the original summary judgment was issued in error.

We thus affirm the judgment of the Appellate Division under review.

## I.

### A.

#### 2006 Summary Judgment Record

We turn first to the December 1, 2006, summary judgment record which we view in a light most favorable to plaintiff, the non-moving party. *R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).[1] So viewed, the facts in the record are as follows: In 2002, defendants, John Torrence, Christopher Masso, and James Githens, decided to "flip a property." Masso and Torrence would finance the deal, and Githens, through Tara Construction Services, Inc. (Tara Construction), would complete renovations. Thereafter, Masso, Torrence, and Githens' wife, who had no apparent role in the deal, formed MTG Properties, LLC (MTG) to renovate and sell a house, known as 121 Nokomis Trail, in Medford Lakes, New Jersey.

Defendant, Jennifer Lynch, a real estate agent who is Githens' sister and Masso's cousin by marriage, brought the Nokomis Trail property to MTG's attention and represented MTG in its initial purchase for approximately $180,000. Lynch, who was associated with Prudential Fox and Roach Realtors (Prudential), also proposed renovations and marketing strategies to the group and acted as the listing agent. She received commissions for the purchase and sale of the property.

In 2003, plaintiff, Debra Lombardi, recently divorced, was looking to relocate to the Medford, New Jersey, area, from New York City. She retained Brenda Richmond, of Weichert Realtors, to act as her real estate agent. When plaintiff first visited the Nokomis

---

[1] The parties have agreed to the contents of that record. We pass no judgment on the truth of the facts alleged; we merely accept them for the purpose of reviewing the grant of summary judgment.

Trail property with Richmond, it was a wreck—practically gutted. Lynch was present when plaintiff first viewed the house, as was Githens, who identified himself as the contractor for the renovations. Githens explained to plaintiff the plans for the renovations, showed her drawings, and promised to include her in the selection of colors and appliances if she purchased the house. Plaintiff made an offer of $360,000 on the house, which defendants accepted. Githens and Lynch promised plaintiff the renovations would be complete before closing, which was scheduled for June 30, 2003.

Paragraph 14 of the April 22, 2003, sales contract for the house, which was signed by Masso and Torrence individually, stated that the house and property "shall be transferred in the same condition as they now appear.... This means that the property is being sold 'AS IS' *unless otherwise warranted hereinafter.*" (Emphasis added). In addition, paragraph 15 of the contract provided: "Seller not liable to buyer after settlement. All warranties, guarantees, representations of seller concerning the property ... *unless otherwise set forth in writing* shall be absolutely void after settlement...." (Emphasis added). Paragraph 37F was hand-written into the contract: "See construction addendum attached." That three-page addendum reflected at least seventy repairs and renovations to be completed by the sellers. Included were items such as siding, HVAC systems, floors, windows, steps, sheetrock, lighting, bathroom fixtures and vanities, and a new driveway, to name a few. The addendum, which was signed by Masso and Torrence, stated that the names of the sellers should be changed to MTG Properties.

Plaintiff did not meet Masso until the closing on July 16, 2003. She has never met Torrence. At the closing, the house was nowhere near completion. In fact, Masso left the closing to determine its condition. When he returned, he agreed to place $10,000 in escrow, gave plaintiff a hug and said "he would take care of everything and that he would never let a single mom with twins live in a house in that condition."

Lynch assured plaintiff that Masso's word was good and that "he would not take advantage of family." It was at that point that plaintiff first learned that Lynch and Masso were related. It is unclear when she found out that Lynch and Githens were siblings; what is clear is that she did not know of their relationship when she entered into the contract to buy the house. Plaintiff's real estate expert, Dominic Natale, expressed the opinion that, under *N.J.A.C.* 11:5–6.4, which requires disclosure of "actual or potential conflicts of interest which the licensee may reasonably anticipate," Lynch should have disclosed to plaintiff her relationship to Masso and Githens.

The escrow agreement, which was signed by Christopher Masso, listed MTG as the seller and Tara Construction as MTG's general contractor. Pursuant to the terms of the agreement, the escrow was to be held until August 1, 2003, by which time, "the *Seller*, by and through its general contractor [Tara Construction], shall complete the punchlist items and review same with buyer." (Emphasis added). The page of outstanding punch-list items, agreed to between plaintiff and Githens, was attached. The escrow agreement further stated that "[u]pon receipt of notice from Buyer and Seller, Escrow agent shall release the escrow amount *to the Seller* and this Agreement shall be cancelled and all rights and obligations of the parties under this Agreement shall automatically terminate." (Emphasis added). Thus, the agreement contemplated the completion of all the punch-list items by the seller, MTG, and required consent from both plaintiff and MTG for the release of the escrowed funds.

Despite the escrow agreement, Richmond advised plaintiff not to close on the house. When plaintiff elected to go forward with the closing, Richmond asked her to sign a waiver, releasing herself and Weichert Realty from any liability. The waiver provided that Richmond advised plaintiff "not [to] proceed with the closing on the ... property at this date due to the amount of work that is still not completed at the time of settlement." Plaintiff signed the waiver.

After the closing, the house remained unfinished. Githens worked on it sporadically but failed to pay the subcontractors and failed to purchase supplies. As a result, little work was completed. Lynch told plaintiff, "she would take care of it, she would speak with him, speak with Chris [Masso] and assured [her] that this work would get done." When plaintiff visited the property with Masso and Lynch to show them its unfinished condition, Masso said he would give Githens one more chance to finish the project. Failing that, he would get another contractor.

In early August 2003, Githens approached plaintiff and asked her to release the escrow funds. He claimed that Masso was not providing him the money necessary to complete the renovations and that he could not finish the job without the escrow funds. He told plaintiff that if she released the money "he would be able to continue working on the house." Githens provided plaintiff a check for $10,000 as security to cover the escrow, and plaintiff signed the form to release the funds. When Githens still failed to complete the work, plaintiff attempted to negotiate his check, but it bounced.

Plaintiff then contacted Masso who expressed surprise that the work had not been completed. At that time, Masso stated that all the monies had been "dispersed." To the contrary, Githens contended that he made it clear to Masso that he had "no more money" and "couldn't do any more work." Githens also said he did not receive the money plaintiff placed in escrow, which was released to MTG Properties. At some point, Masso told Githens not to contact him further, and it is unknown who received the escrow money. With the house still completely unfinished, plaintiff filed suit.

B.

*Procedural History*

Plaintiff filed a Superior Court complaint on January 13, 2004. The complaint asserted claims against Masso, Torrence, MTG,

Githens, Tara Construction, Lynch, and Prudential based on "uncompleted and improperly completed construction work." Included were claims for breach of contract, "legal and equitable fraud," "intentional misrepresentation and/or fraud," Consumer Fraud Act (CFA) violations under *N.J.S.A.* 56:8-1 to –20, negligence, and conspiracy. The complaint separately alleged breach of warranty against Githens and breach of fiduciary duty against Lynch and Prudential. Prudential's liability was derivative, based on the agency of Lynch.

All defendants, except Githens and Tara Construction, moved for summary judgment. The gravamen of their motion was that Githens was an independent contractor hired to renovate the property and was the only party responsible for its condition. Defendants further argued that: the contract was for the property "as is" and created no further obligation; once the escrow was paid, all parties were released from liability; no misrepresentations were made by them; and the CFA did not apply. In granting the motion, the trial judge found that: plaintiff accepted the property "as is"; no agency relationship was established between Githens and the other defendants; defendants did not breach the contract; no facts supported piercing the corporate veil; defendants made no misrepresentations prior to entering the contract or thereafter; and defendants could not be held liable under the CFA. He issued an order to that effect on December 1, 2006. In August 2007, plaintiff sought reconsideration, which was denied as untimely and without merit on August 3, 2007.

## C.

### *The Proof Hearing*

On the same date, the trial judge conducted a proof hearing and set damages in the amount of $520,000, plus $122,425 in counsel fees,[2] against Githens, who had defaulted.[3] The proof hearing

---

[2] Although the record before us does not contain the transcript of the judge's ruling, we presume the damage figure was reached by trebling under the CFA. *See N.J.S.A.* 56:8-19.

spanned several days during which the court heard live testimony from plaintiff and her damages expert, along with excerpts from Githens' November 29, 2005, deposition. Plaintiff's testimony at the proof hearing was a more detailed version of what was in the summary judgment record. Also, some of the excerpts from Githens' deposition that were submitted were different from those that were provided at the summary judgment phase. On August 6, 2007, the trial judge wrote a letter to all parties, including the dismissed defendants, advising them that he felt it necessary to reconsider his original order granting summary judgment, as a result of what he had heard at the proof hearing. The judge concluded that:

> The dynamics of this case appear[ ] to be far more complicated than the various briefs, certification and perhaps my prior decisions may demonstrate. Thus, in the interest of justice, a second argument will be very important.
>
> Fairness dictates that all of the parties have an opportunity to review the proof hearing proceeding and to make any additional submissions necessary.

The judge notified all parties, including the dismissed defendants, about his concerns and scheduled a hearing on the issue. The parties were provided with audiotapes of the proof hearing, the exhibits, and were afforded two months to prepare for the hearing.

### D.

### *The Rehearing*

On the November 16, 2007, return date, defendants' basic contention was that the judge was without power to reconsider the original grant of summary judgment based on what he had heard at the proof hearing. The judge disagreed: "while a case is pending a trial judge has the inherent discretion to seek to correct any perceived mistakes that [he or she] made. I have that right to do that. This case is still before me, and to just blindly ignore something would be wrong to do." The judge explained that he "wanted to give these other parties who [he] let out an opportunity to be heard on that, because that's the fair thing to do." He also

---

3 Tara Construction apparently defaulted as well.

noted that the decision to revisit the grant of summary judgment was done at his "initiative" and "was not done at the request of plaintiff's counsel."

At the rehearing, the judge attempted several times to explain his reasoning for reconsidering his earlier decision to grant summary judgment. He stated:

> The summary judgment was based upon the certifications of the parties and the exhibits presented. And as I said a few moments ago, I think that—that where I was in error that there were sufficient conflicts in those certifications and I shouldn't have relied upon them and that was borne—that came out—was made clearer to me after hearing some of the testimony that I made available to you. Had that testimony been available to me prior to the certifications, it's doubtful that I would have entered summary judgment.

When pressed by defense counsel for specifics as to what made him change his mind, the trial judge again attempted to clarify his reasons:

> Well, I'm going to issue a written opinion which I think is probably a better way to do this. After I heard the hearing in its entirety I came to the conclusion that there were significant factual issues related to the ones that you enumerated that I relied upon in the certifications. There were conflicting certifications to begin with, and our Courts have clearly said that when you have conflicting certification[s] that almost mandates that there be some sort of hearing to resolve those certifications.
>
> And so, fairness and justice, if in the end when the dust all settles your clients may be proven to be as pure as the new driven snow. I don't know. But all I know is that I think I inappropriately relied upon those certifications and their conflicts. And that was borne out to me in spades, so to speak, after the proof hearing.

After the rehearing, the judge vacated the grant of summary judgment in favor of defendants and issued a written opinion in which he found that the original summary judgment record presented genuine issues of material fact regarding agency, breach of contract, fraud, misrepresentation, and CFA violations. In addition, the judge noted that he had been in error in ruling that real estate professionals are not subject to the CFA.

## E.

### The Interlocutory Appeal

On January 9, 2008, the Appellate Division granted defendants' motion for leave to appeal, and summarily remanded the matter to

the trial court for further findings of fact and conclusions of law. The trial judge issued supplemental findings on February 4, 2008, and reiterated his conclusion that the case presented material issues requiring trial. He stated that his November 16 order "stemmed from" the proof hearing.

The Appellate Division again granted leave to appeal. In its January 28, 2009, opinion, the panel reversed the trial court without addressing the merits of the original grant of summary judgment. "In doing so, [it] did not consider the various analyses set forth by the trial court in its several written opinions" because it was "satisfied that the procedure [the trial court] employed was unauthorized and unwarranted." Citing *Zeiger v. Wilf,* 333 *N.J.Super.* 258, 269–70, 755 *A.*2d 608 (App.Div.), *certif. denied,* 165 *N.J.* 676, 762 *A.*2d 657 (2000), it determined that the trial judge improperly relied upon evidence presented at the proof hearing in reversing its prior grant of summary judgment. The panel, thus, reinstated the trial court's December 1, 2006, order granting summary judgment in favor of the moving defendants without addressing the merits of that order.

Following that decision, but prior to the entry of final judgment against Githens, plaintiff again moved for reconsideration of the grant of summary judgment. That motion was denied on June 12, 2009. The final judgment against Githens was entered on July 13, 2009.[4]

## F.

### *The Appeal*

On August 28, 2009, plaintiff filed a notice of appeal at the home of a retired Appellate Division judge on recall, challenging the December 1, 2006, order granting summary judgment. Under *Rule* 2:4–1, the notice should have been filed a day earlier. Accordingly, on September 11, 2009, plaintiff filed a motion to

---

[4] That judgment does not mention Tara Construction.

extend the time within which to appeal, pursuant to *Rule* 2:4–4. The Appellate Division granted that motion on October 22, 2009, concomitantly denying defendants' motions to dismiss the appeal. Subsequently, plaintiff filed an amended notice of appeal seeking review, both of the trial court's December 1, 2006, order and June 12, 2009, order denying reconsideration. Neither the original notice nor the amended notice specifically referenced the November 16, 2007, order.

In its ruling, the Appellate Division rejected defendants' contention that there was an impediment to the trial court's review of its own grant of summary judgment, noting that the court is free to revisit any interlocutory order for any reason, at any time, prior to final judgment, in the interests of justice. The panel also rejected defendants' argument that the law of the case doctrine barred the trial court's reconsideration of the summary judgment order and also declared that it was not constrained by the first panel's interlocutory ruling. Further, the panel concluded that defendants received full and fair process in connection with the reconsideration.

The panel then proceeded to the merits of plaintiff's appeal and held that, on the original record presented, the grant of summary judgment was error, detailing the issues of material fact presented and ordering the trial court to resume the case as it stood on November 16, 2007.

We granted defendants' petition for certification, *Lombardi v. Masso*, 204 *N.J.* 40, 6 *A.*3d 443 (2010).

## II.

Defendants Masso, Torrence, and MTG contend that the trial court improperly overturned its prior grant of summary judgment based on evidence produced at the proof hearing, which plaintiff had but did not offer during the original summary judgment proceeding; that they were prejudiced by their absence from the proof hearing; and that the trial court was constrained by the law of the case doctrine from revisiting its December 1, 2006, order,

and that the Appellate Division was similarly constrained from reversing its prior interlocutory order reinstating the summary judgment.

Defendants Prudential and Lynch join in those arguments and raise several other issues as well, including late filing of the notice of appeal at the home of a retired appellate judge on recall and the fact that the notice of appeal did not raise all of the issues addressed by the Appellate Division.

Plaintiff counters that the trial court was empowered, *sua sponte*, to revisit its grant of summary judgment while the case remained in an interlocutory posture. She further contends that the court acted fairly when it provided defendants with notice, a record of the proof hearing, and an opportunity to be heard in respect of its decision to revisit the grant of summary judgment. In addition, plaintiff avers that law of the case is a discretionary doctrine that allows review when required in the interests of justice and that, in any event, the interlocutory appeal did not address the merits of the original summary judgment order. Finally, plaintiff argues that the procedural issues raised do not warrant our intervention.

## III.

Although plaintiff has not challenged the decision of the interlocutory appellate panel reversing the original summary judgment order, it is that order that constitutes the pentimento in the case, painted over by other procedures but at the heart of things. Indeed that order gave rise to the conflict in the Appellate Division, and defendants continue to argue before us that the trial judge was without power to revise his original ruling based on what he heard at the proof hearing. Because that argument, which has been fully explored by the parties, misconceives both the nature of an interlocutory ruling and the court's inherent power to revise such a ruling, we choose to address the issue here. *Pfenninger v. Hunterdon Cent. Reg'l High Sch.*, 167 *N.J.* 230, 235 n. 1, 770 *A.*2d 1126 (2001) (holding in interests of justice and

completeness, court may address issue in absence of cross-petition).

It is well established that "the trial court has the inherent power to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders *at any time* prior to the entry of final judgment." *Johnson v. Cyklop Strapping Corp.,* 220 *N.J.Super.* 250, 257, 531 *A.*2d 1078 (App.Div.1987), *certif. denied,* 110 *N.J.* 196, 540 *A.*2d 189 (1988) (emphasis added). *See also Marconi Wireless Telegraph Co. of Am. v. United States,* 320 *U.S.* 1, 47, 63 *S.Ct.* 1393, 1415, 87 *L.Ed.* 1731, 1757 (1943) (finding trial court has "power at any time prior to entry of its final judgment ... to reconsider any portion of its decision and reopen any part of the case"). That power, which is rooted in the common law, *see, e.g., Lyle v. Staten Island Terra–Cotta Lumber Co.,* 62 *N.J. Eq.* 797, 805, 48 *A.* 783 (E & A 1901), is broadly codified in *Rule* 4:42–2, which provides expansively that "any order ... which adjudicates fewer than all the claims as to all the parties shall not terminate the action as to any of the claims, and it shall be subject to revision *at any time* before the entry of final judgment in the sound discretion of the court in the interest of justice." (Emphasis added); *see also R.* 1:7–4(b) ("Motions for reconsideration of interlocutory orders shall be determined pursuant to *R.* 4:42–2."). That *Rule,* like the jurisprudence on which it is based, sets forth no restrictions on the exercise of the power to revise an interlocutory order.

Thus, for example, the stringent constraints imposed on final judgments and orders under *Rule* 4:50–1 (grounds for relief from judgment) are wholly inapplicable to interlocutory orders. *See Johnson, supra,* 220 *N.J.Super.* at 257–64, 531 *A.*2d 1078 (tracing history of *Rule* 4:50–1 and declaring its "strict and exacting standards" do not apply to interlocutory orders); *see also R.* 4:49–2 (permitting reconsideration of final judgments or orders within 20 days of entry). Indeed, "[a] significant aspect of the interlocutory nature of an order is its amenability to the trial court's control until entry of final judgment without interposition of

considerations appropriate to finality." Pressler & Verniero, *Current N.J. Court Rules*, comment 3 on *R.* 4:42–2 (2011) (citing *Ford v. Weisman*, 188 *N.J.Super.* 614, 458 *A.*2d 142 (App.Div.1983)).

That paradigm echoes federal jurisprudence regarding *Federal Rule of Civil Procedure* 60(b), on which *Rule* 4:50–1 is modeled. *See, e.g., City of Los Angeles v. Santa Monica Baykeeper*, 254 *F.*3d 882, 887 (9th Cir.2001) ("[A] district court's authority to rescind an interlocutory order over which it has jurisdiction is an inherent power rooted firmly in the common law and is not abridged by" *Rule* 60(b) which governs final judgments.); *Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 *F.*2d 1265, 1269 (5th Cir.1986) (finding partial summary judgment "remain[ed] within the plenary power of the district court to revise or set aside in its sound discretion without any necessity to meet the requirements of *Fed.R.Civ.P.* 60(b)"); *United States v. Jerry*, 487 *F.*2d 600, 604 (3d Cir.1973) ("[T]he power to grant relief from erroneous interlocutory orders, exercised in justice and good conscience, has long been recognized as within the plenary power of courts until entry of final judgment and is not inconsistent with any of the *Rules*."); *see also Hubbard v. State Farm Indem. Co.*, 213 *W.Va.* 542, 584 *S.E.*2d 176, 186 (2003) (holding trial court erred in viewing interlocutory order "under the limited authority granted it by [West Virginia] *Rule* 60(b)" rather than pursuant to "its inherent power to revisit interlocutory orders").

 In short, although a party who obtains summary judgment may believe he is absolutely free of the litigation, "[i]t is a contradiction in terms to say that an interlocutory decree should be a finality." *Fid. Union Trust Co. v. Petchensky*, 119 *N.J. Eq.* 514, 516, 183 *A.* 472 (Ch.1936). "The policy that litigation must have an end is not threatened in such a case, because litigation has not yet terminated." *Ford, supra*, 188 *N.J.Super.* at 619, 458 *A.*2d 142. In other words, a party's sense of finality upon summary judgment is just that—a feeling unsupported by the notion of what

is, in fact, interlocutory. Interlocutory orders are always subject to revision in the interests of justice.[5]

Although the rule is expansive, the power to reconsider an interlocutory order should be exercised "only for good cause shown and in the service of the ultimate goal of substantial justice." *Johnson, supra,* 220 *N.J.Super.* at 263–64, 531 *A.*2d 1078; *see Melancon v. Texaco, Inc.,* 659 *F.*2d 551, 553 (5th Cir.1981) (finding trial court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient"); *Ford, supra,* 188 *N.J.Super.* at 619, 458 *A.*2d 142 (holding court "has complete power over its interlocutory orders and may revise them when it would be consonant with the interests of justice to do so").

That special power afforded to judges over their interlocutory orders derives from the fact that cases continue to develop after orders have been entered and that judges likewise continue to think about them. In other words, contrary to defendants' claims, the mere fact that the proof hearing precipitated the judge's reconsideration of the summary judgment order is not of concern.

Defendants further contend that, regardless of what may have triggered the judge's unease with his earlier opinion, he was confined in his reconsideration to the original summary judgment record. Plaintiff argues that the judge, in fact, confined himself to the original record; defendants say he did not. Although we are not sure whether the judge cabined off the original record, we need not resolve that conflict because there is nothing in our law that would require him to do so.

As we have said, where a litigation has not terminated, an interlocutory order is always subject to revision where the judge believes it would be just to do so. The rules governing final

---

[5] To the extent that *Zeiger, supra,* 333 *N.J.Super.* at 269–70, 755 *A.*2d 608, was informed by the notion that an interlocutory grant of summary judgment is final, it is out of synchronicity with those well-established principles, and it is disapproved.

judgments, for example, that evidence must be newly discovered to be considered, *R.* 4:50–1(b), do not apply in the interlocutory setting. Nor is the judge constrained, as would a reviewing court be, by the original record. *See, e.g., Ji v. Palmer,* 333 *N.J.Super.* 451, 463–64, 755 *A.*2d 1221 (App.Div.2000) (refusing to consider evidence presented for first time on appeal and confining review to summary judgment record before trial court).

 We presume that judges ordinarily will not be required to second guess themselves because most attorneys will advance the best case possible the first time around, thus obviating later theoretical or evidential surprises. But where that does not occur, for whatever reason, and the judge later sees or hears something that convinces him that a prior ruling is not consonant with the interests of justice, he is not required to sit idly by and permit injustice to prevail.[6] In such an exceptional case, the judge is empowered to revisit the prior ruling and right the proverbial ship. That entitlement to change a prior ruling in the interests of justice is what distinguishes an interlocutory order from a final judgment.

 Procedurally, where a judge is inclined to revisit a prior interlocutory order, what is critical is that he provide the parties a fair opportunity to be heard on the subject. It is at such a proceeding that the parties may argue against reconsideration and advance claims of prejudice, e.g., missing witnesses, destroyed evidence. Moreover, once the judge has determined to revisit a prior order, he needs to do more than simply state a new conclusion. Rather, he must apply the proper legal standard to the facts and explain his reasons. In the case of reconsideration of summary judgment, for example, the judge should apply *Rule*

---

[6] This opinion, which is solely addressed to the judge's *sua sponte* exercise of his power to reconsider a previous interlocutory ruling, should not be read as approving vexatious, repetitive motions for reconsideration by a disappointed litigant or as limiting, in any way, a judge's power to sanction such conduct.

4:46–2 and explain what genuine issues of material fact require trial.

■ That is exactly what occurred here. During the proof hearing, the judge heard more complete evidence from plaintiff than had been provided to him earlier. He then advised the parties of his concern that the case was more complex than he had originally intuited and gave them the record of the proof hearing, ample time to prepare, and an opportunity to weigh in on what he was considering. After the hearing, he wrote an opinion explaining that he had made some legal errors and that there were genuine issues of material fact presented by the summary judgment record that he had simply missed. Defendants did not persuade the judge that they were prejudiced by his order vacating the summary judgment. To be sure, they will have to defend the case. But that is not the kind of prejudice that would warrant interfering with the order. In short, we have concluded that the trial judge abided by all of the relevant principles in determining to revisit his original summary judgment order.

## IV.

■ We next address defendants' contention that the law of the case doctrine separately precluded the trial court and the Appellate Division from revisiting the prior interlocutory order. The law of the case doctrine teaches us that a legal decision made in a particular matter "should be respected by all other lower or equal courts during the pendency of that case." *Lanzet v. Greenberg*, 126 *N.J.* 168, 192, 594 *A.*2d 1309 (1991) (citing *State v. Reldan*, 100 *N.J.* 187, 203, 495 *A.*2d 76 (1985); *State v. Hale*, 127 *N.J.Super.* 407, 410–11, 317 *A.*2d 731 (App.Div.1974)). It is a nonbinding rule intended to "prevent relitigation of a previously resolved issue." *In re Estate of Stockdale*, 196 *N.J.* 275, 311, 953 *A.*2d 454 (2008) (citing Pressler, *Current N.J. Court Rules*, comment 4 on *R.* 1:36–3 (2008)). "A hallmark of the law of the case doctrine is its discretionary nature, calling upon the deciding judge to balance the value of judicial deference for the rulings of a

coordinate judge against those 'factors that bear on the pursuit of justice and, particularly, the search for truth.' " *Hart v. City of Jersey City,* 308 *N.J.Super.* 487, 498, 706 *A.*2d 256 (App.Div.1998) (quoting *Reldan, supra,* 100 *N.J.* at 205, 495 *A.*2d 76).

Importantly, the law of the case doctrine is only triggered when one court is faced with a ruling on the merits by a different and co-equal court on an identical issue. *See, e.g., Gonzalez v. Ideal Tile Imp. Co.,* 371 *N.J.Super.* 349, 355–56, 853 *A.*2d 298 (App.Div.2004), *aff'd by,* 184 *N.J.* 415, 877 *A.*2d 1247 (2005), *cert. denied,* 546 *U.S.* 1092, 126 *S.Ct.* 1042, 163 *L.Ed.*2d 857 (2006); *Rosenberg v. Otis Elevator Co.,* 366 *N.J.Super.* 292, 301–02, 841 *A.*2d 99 (App.Div.2004); *Cineas v. Mammone,* 270 *N.J.Super.* 200, 207–08, 636 *A.*2d 1071 (App.Div.1994). It is entirely inapposite where, as here, in trial court proceedings, the same judge is reconsidering his own interlocutory ruling. *City Check Cashing, Inc. v. Jul–Ame Constr. Co.,* 326 *N.J.Super.* 505, 519, 742 *A.*2d 141 (App.Div.1999), *rev'd on other grounds sub nom, City Check Cashing v. Mfrs. Hanover Trust Co.,* 166 *N.J.* 49, 764 *A.*2d 411 (2001). Because such a ruling is always subject to reconsideration up until final judgment is entered, *Johnson, supra,* 220 *N.J.Super.* at 257, 531 *A.*2d 1078, it is not considered "law of the case." *See Franklin Med. Assocs. v. Newark Pub. Schs.,* 362 *N.J.Super.* 494, 512, 828 *A.*2d 966 (App.Div.2003).

The application of the doctrine is more complicated in connection with the appellate proceedings in this matter. Under the law of the case doctrine, an interlocutory ruling by the Appellate Division generally is not subject to review on direct appeal. *See State v. Myers,* 239 *N.J.Super.* 158, 164, 570 *A.*2d 1260 (App.Div.), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990). However, that principle must be understood in light of the goal of the doctrine: the avoidance of "relitigation of a previously resolved issue." *Stockdale, supra,* 196 *N.J.* at 311, 953 *A.*2d 454. Here, defendants' reliance on the doctrine is based on a fundamental misconception regarding what was litigated in the two proceedings. The interlocutory panel decided defendants' narrow claim

that the judge could not use evidence from the later proof hearing in his analysis. In doing so, it reinstated the original summary judgment order without a merits review and thus preserved that issue for direct appeal. The direct appeal panel, in turn, faced the issue that had not been addressed on interlocutory review: whether the original grant of summary judgment was correct. To be sure, the panel wandered afield in differing with the interlocutory ruling regarding the right of the judge to revisit his earlier summary judgment order.[7] But, even if the panel had deferred to that ruling, the outcome would have been the same because the merits of the original grant of summary judgment were not addressed by the interlocutory panel. Thus, on direct appeal, the court was not only empowered to rule on the merits of plaintiff's claim, it was required to do so.

## V.

We turn next to defendants' challenge to irregularities in the filing of plaintiff's appeal which, they argue, should have barred its consideration, in whole or in part, by the Appellate Division. First, they contend that the filing at the house of a recalled Appellate Division judge was not only late, but also improper. An appeal from a final judgment must be filed with the Appellate Division within forty-five days of its entry, *R.* 2:4-1, and served upon all other parties, *R.* 2:5-1(a). As a matter of practice:

> To ensure proper filing, counsel should be certain that the notice of appeal is filed with the Clerk of the Appellate Division by 5 p.m. on the last day permitted for filing. If the notice must be filed at the end of the time period, it may be filed at the chambers of any Appellate Division judge.
>
> [New Jersey Appellate Practice Study Committee of the New Jersey Bar Association, *N.J. Appellate Practice Handbook* § 3.6 (2008).]

In the event that the time limits in *Rule* 2:4-1 are not satisfied, for example, where the notice is late, a motion to extend the time for appeal may be filed, pursuant to *Rule* 2:4-4, for a period not

---

[7] Although the panel may have overstepped on that issue, we are under no such constraint.

exceeding thirty days. That motion must be served and filed within the time as extended.

■ Here, plaintiff filed her notice of appeal on August 28, 2009, when the forty-fifth day was August 27, 2009. Thereafter, she made a timely motion to extend the period within which to appeal, based upon a mix-up that had occurred in her lawyer's office. That motion was granted and defendants' concomitant motions to dismiss the appeal were denied. On the record presented, we find no reason to conclude that the grant of the motion to extend time was an abuse of the Appellate Division's broad discretion to control proceedings before it.

■ To be sure, we disapprove of the self-help plaintiff's lawyer undertook by presenting himself at the house of an appellate judge. A lawyer who happens to know where a judge lives is not entitled to an advantage over lawyers who do not have such information. Although filing may take place at a judge's chambers, the judge's house is off limits. The only exception is the case of an emergency [8] with respect to which late filing clearly does not qualify. Nevertheless, we are satisfied that the Appellate Division's acceptance of plaintiff's initial filing, through the order to extend time, also fell within its discretion and does not warrant our intervention.

Finally, defendants argue that plaintiff did not reference the November 16, 2007, order in the notice of appeal and that the appellate panel "provide[d] relief plaintiff did not request." It was, of course, defendants who interposed the interlocutory Appellate Division decision on the November 16 order as a bar to the relief plaintiff was seeking. That required some response from the appellate panel. Moreover, as we have said, even if the panel had agreed with the interlocutory order, what was before it was

---

[8] The Appellate Division has promulgated procedures for true emergencies after hours, including a list of specifically assigned emergent judges. *See, e.g., Notice to the Bar*, Sup.Ct.App. Div., Emergent Applications, Jun. 8, 2009 to Sept. 13, 2009 (Jun. 9, 2011).

plaintiff's request for a declaration invalidating the original grant of summary judgment. That is exactly the relief she received. Defendants' further contention that the judge's later denial of reconsideration should continue to be binding because it occurred after the November 16 order is equally unpersuasive. The judge obviously considered himself bound by the interlocutory ruling at that point. For all those reasons, defendants' claims regarding the notice of appeal are without merit.

## VI.

Because we have rejected defendants' procedural challenges to the Appellate Division judgment, we turn briefly to the merits and, in so doing, confine ourselves to the original summary judgment record because that is the limited issue before us.[9] *See Ji, supra,* 333 *N.J.Super.* at 463–64, 755 *A.*2d 1221 (explaining appellate court "can 'consider the case only as it had been unfolded to that point' and the evidential material submitted on that motion") (quoting *Bilotti v. Accurate Forming Corp.,* 39 *N.J.* 184, 188, 188 *A.*2d 24 (1963)). In other words, our charge at this stage is to look to the original summary judgment record, the contents of which have been agreed on by the parties, and to determine whether, viewed in a light most favorable to plaintiff, it presented genuine issues of material fact requiring trial. We conclude that it did.

We begin by noting, as did the Appellate Division, that the grant of summary judgment was rooted in several legal misconceptions. First, as the judge himself pointed out in his November 16 order, his conclusion that the CFA did not apply to realtors was erroneous. *See N.J.S.A.* 56:8–2 (declaring CFA applies to fraud and misrepresentation "in connection with the sale or advertisement of . . . real estate"). For the purposes of this appeal,

---

[9] To the extent that the dissent suggests that we have looked beyond that record, it is mistaken.

Prudential and Lynch have not challenged that determination. The CFA violations apply equally to the sellers.

Second, the judge apparently accepted defendants' claim that the contract for the house was "as is" (paragraph 14) and "that seller is not liable to buyer after settlement" (paragraph 15). However, both provisions were overridden by the addendum, which acknowledged, in writing, at least seventy outstanding renovations and repairs that the sellers promised to complete.

Third, the judge agreed with defendants that the requirements of the escrow contract were imposed only on Githens because he negotiated the punch list with plaintiff. But the escrow contract itself bound "the *sellers*" to complete the punch-list repairs and was signed individually by Masso. (Emphasis added).

More importantly, the judge apparently credited defendants' claim that the release of the escrow funds also released them from any further obligation under the contract of sale. That conclusion elided any consideration of plaintiff's testimony that Githens induced her to release the escrow by his misrepresentation that only if she released it would the work continue.

Although Masso and Torrence contend that Githens was an independent contractor for whose actions or inactions they were not responsible, the record is replete with evidence that could lead to a different conclusion. For example, there was evidence upon which a fact finder could conclude that Masso, Torrence, and Githens together hatched the plan to flip the Nokomis Trail property; that when they created MTG (Masso, Torrence, Githens), they substituted Githens' wife, who played no actual part in the deal, to permit them to denominate Githens as an independent contractor, for whom they bore no responsibility; and that Githens was, in fact, a principal of MTG or, at the very least, its agent.

With respect to Lynch, who tried to portray herself as an arms-length real estate professional, there was evidence that she, along with Githens and Masso, hid the fact that they were relatives from the plaintiff, at least until the eleventh hour. (Plaintiff's expert

opined that that was a breach of Lynch's fiduciary duty as a realtor.) Moreover, the record reveals that Lynch, who received commissions on both the purchase and sale of the Nokomis Trail property, actually brought the deal to Masso, Torrence, and Githens and participated in deciding which renovations should be done and in marketing the property on behalf of MTG. In addition, there was evidence that Lynch, along with Masso and Githens, individually and in concert, induced plaintiff to purchase the Nokomis Trail property by making promises regarding the renovation of the property that were not kept. Indeed, defendants do not claim that the renovations were ever completed. Whether the promises of Githens, Lynch, and Masso were made to plaintiff without the intent to perform, is an issue uniquely suited for trial. *See* Pressler & Verniero, *supra*, comment 2.3.4 on *R.* 4:46–2 ("[M]otion [for summary judgment] should ordinarily not be granted where an action or defense requires determination of a state of mind or intent, such as claims of waiver, bad faith, fraud or duress.").

Further, although he denied it, there was evidence that Masso knew the property work was not complete and, yet, released the escrow. Also, there was evidence that Masso, not Githens, actually received the escrow money and that Masso's suggestion that the money had been "dispersed" and was thus no longer available to fund the renovations was, at best, misleading.

Although plaintiff may not have done as much to protect her own legal interests as she should have, when this record is reviewed globally, as it must be, it is the relationship of Masso, Torrence, Githens, and Lynch and their intentions, which emerge as the heart of the case and which require an assessment by a jury. Plaintiff claims that defendants conspired to induce her to purchase a wreck of a house, at twice the price they bought it for, by promising repairs and renovations that they never intended to complete, and, in fact, did not complete. Those claims are the subject of conflicting evidence and should have been recognized, as the trial judge ultimately did, as presenting genuine issues of

material fact warranting denial of summary judgment. We, therefore, affirm the Appellate Division's judgment to that effect.[10]

## VII.

The judgment of the Appellate Division is affirmed.

Justice RIVERA–SOTO, dissenting.

In cobbling together a species of unwarranted relief for plaintiff Debra Ann Lombardi, the majority overlooks a core, fundamental precept: that summary judgment motions are to be gauged based exclusively on the summary judgment record adduced by the parties, and not with reference to supplementary proofs the opposing party had but nevertheless failed to produce in timely opposition. Basing its decision on facts plaintiff belatedly revealed to the trial court only after the trial court already (1) had granted summary judgment to defendants and (2) had denied a motion for reconsideration thereof, the majority encourages or, at the very least, condones the sloppy, unprofessional practices our detailed and quite specific summary judgment rules are designed to interdict. For that reason, I must dissent.

## I.

All defendants—save for James Githens and Tara Construction Services, Inc.[1]—moved for summary judgment in respect of plaintiff's January 13, 2004 complaint. That procedural maneuver

---

[10] In their petition for certification, defendants do not address the various counts of the complaint individually, choosing instead to advance a broad-brush attack on the process that led to the ultimate denial of summary judgment. It may be that one or more of the claims should have been dismissed. We leave it to the trial judge on remand to address such particularized claims, if they are raised.

[1] All references to "defendants," therefore, are to defendants Jennifer Lynch and Prudential Fox & Roach Realtors, and defendants Christopher J. Masso, John M. Torrence, and MTG Properties, LLC, specifically excluding defendants James Githens and Tara Construction Services, Inc.

triggered certain non-delegable or non-waivable obligations from the parties.

Motions for summary judgment are distinctly unique under our *Rules of Court*. The *Rules* require a strict timetable for the filing of moving and opposing papers, and specifically provide that, other than the designated moving and opposition papers, "[n]o other papers may be filed without leave of court." *Rule* 4:46–1. Standing apart from any other motion cognizable in our courts, the *Rules* specifically require that summary judgment motions be supported by a statement of material fact complying with the following:

> The statement of material facts shall set forth in separately numbered paragraphs a concise statement of each material fact as to which the movant contends there is no genuine issue together with a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted. The citation shall identify the document and shall specify the pages and paragraphs or lines thereof or the specific portions of exhibits relied on.
>
> [*R.* 4:46–2.]

That requirement is not illusory; this Court has deemed that obligation so elementary to the proper exercise of the judiciary's adjudicatory process that the *Rules* further command that "[a] motion for summary judgment may be denied without prejudice for failure to file the required statement of material facts." *Ibid.*

Once a summary judgment motion is properly made and supported, its opponent cannot sit idly by. The *Rules* impose an affirmative obligation on the party adverse to a motion for summary judgment to squarely meet the assertions in the movant's statement of material facts. *R.* 4:46–2(b) ("A party opposing the motion *shall* file a responding statement either admitting or disputing each of the facts in the movant's statement." (emphasis supplied)). A party opposing a motion for summary judgment ignores this requirement at its peril: "Subject to *R.* 4:46–5(a), all material facts in the movant's statement which are sufficiently supported will be deemed admitted for purposes of the motion only, unless specifically disputed by citation conforming to the requirements of [*Rule* 4:46–2](a) demonstrating the existence of a genuine issue as to the fact." *Ibid.* The adverse party is not

limited by the scope of the movant's statement of material facts; the opponent "may also include in the responding statement additional facts that the party contends are material and as to which there exists a genuine issue[,]" *ibid.*, provided, of course, that those additional facts likewise are properly supported as required under the *Rules*. *Ibid.* (requiring that, in opposing statement of material facts, "[e]ach such fact shall be stated in separately numbered paragraphs together with citations to the motion record.").

Facts tendered as material either in support or in opposition to a motion for summary judgment motion must be anchored to a proper basis. The *Rules* plainly provide that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the pleading, but must respond by affidavits meeting the requirements of *R.* 1:6–6 [2] or as otherwise provided in this rule and by *R.* 4:46–2(b), setting forth specific facts showing that there is a genuine issue for trial.

[*R.* 4:46–5(a).]

Unless the party opposing summary judgment demonstrates that it in fact and in good faith is unable to respond by affidavit to the movant's statement of material facts, the penalty for non-compliance is severe: "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered[.]" *Ibid.* Further, if it appears to the court that

any of the affidavits submitted pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses resulting from the filing of the affidavits, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

[*R.* 4:46–5(b).]

---

[2] *Rule* 1:6–6 defines the requirements for affidavits; it explicitly provides that

[i]f a motion is based on facts not appearing of record or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify and which may have annexed thereto certified copies of all papers or parts thereof referred to therein. The court may direct the affiant to submit to cross-examination, or hear the matter wholly or partly on oral testimony or depositions.

Once a summary judgment motion is properly presented, and "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law[,]" the court's obligation is clear: "[t]he judgment or order sought shall be rendered forthwith[.]" *R.* 4:46–2(c); *see also State v. Hupka,* 203 *N.J.* 222, 241, 1 *A.*3d 640 (2010) (describing as "black letter law that where a material factual matter is contested, it cannot be relied on without a resolution of the disputed evidence" and citing *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), as "setting forth standard for determining whether material factual dispute precludes grant of summary judgment").

Even if a motion for summary judgment is not granted in full, *see R.* 4:46–3 (addressing partial judgment), the court retains considerable discretion, as "[l]eave to proceed may be given unconditionally, or upon such terms as to giving security, or time or mode of trial, or otherwise, as is deemed just." *R.* 4:46–4. Also, the negative repercussions to a party adverse to a summary judgment motion arising from the failure to respond properly and with sufficient, verifiable facts do not end with the adjudication of the motion itself. As an exception to New Jersey's overall adherence to the "American Rule," *see In re Estate of Vayda,* 184 *N.J.* 115, 120, 875 *A.*2d 925 (2005) (reaffirming that " 'New Jersey has a strong public policy against the shifting of costs' and that '[t]his Court has embraced that policy by adopting the "American Rule," which prohibits recovery of counsel fees by the prevailing party against the losing party' " (quoting *In re Niles,* 176 *N.J.* 282, 293–94, 823 *A.*2d 1 (2003))), *Rule* 4:46–6 specifically provides that

[i]n an action tried to conclusion in which the prevailing party had made a pretrial motion for summary judgment or partial summary judgment that was denied, the court may, on motion, award counsel fees to the prevailing party if it finds that the denial of the motion was based on a factual contention raised in bad faith by the party opposing the motion with knowledge that it was a palpable sham or predicated on facts known or which should have been known to be false. The motion shall be made to the trial court and shall be decided on the basis of the

record made in the summary judgment motion and the trial of the cause. The award of counsel fees shall be limited to those legal services rendered on the motion for summary judgment and for such subsequent services as were compelled by its denial.

Based on the *Rule*-defined, specifically tailored summary judgment record before it, the trial court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*, 189 *N.J.* 436, 445–446, 916 *A.*2d 440 (2007) (citations and internal quotation marks omitted). That limitation— that a summary judgment determination is defined and limited by the summary judgment record—also applies on appeal. *Estate of Hanges v. Metro. Prop. & Cas. Ins. Co.*, 202 *N.J.* 369, 378 n. 3, 997 *A.*2d 954 (2010) (noting that "[i]n respect of a summary judgment motion, an appellate court is bound by the summary judgment factual record developed before the trial court and applies to that record the governing legal standards" (citation omitted)).

Those time-honored and jurisprudentially sound principles define our inquiry in this appeal. And, those are the very principles the majority eschews to reach its desired but wrongful result.

## II.

As explicitly represented by plaintiff on her direct appeal, the original summary judgment record developed before the trial court consisted, in its entirety, of the following four items:

1. Certification of Counsel and Statement of Undisputed Material Facts and exhibits in support of [defendants] Jennifer Lynch and Prudential Fox & Roach Realtors' motion for summary judgment[;]

2. Statement of Undisputed Material Facts and exhibits in support of [defendants] Christopher J. Masso, John M. Torrence, [and] MTG Properties, LLC's motion for summary judgment[;]

3. Certification of [plaintiff's counsel in opposition to defendants' motion for summary judgment; and]

4. Plaintiff's [Counter-]Statement of Undisputed Material Facts.

Based on that party-generated summary judgment record, on December 1, 2006, the trial court granted defendants' motion for

summary judgment. Given that record—one developed by, presented by and informed by parties represented by experienced counsel—the trial court found the following facts, none of which are contested by the parties and which, given the majority's reasoning and result, merit recitation in their entirety. The trial court found as undisputed facts that

> [t]his case arises out of a sale for the contract of land. In the spring of 2003, [plaintiff] with the help of her real estate agent, Brenda Richmond ("Richmond") [of Weichert Realtors], found a home located at 121 Nokomis Trail, Medford Lakes, New Jersey. The property had been purchased that winter by [defendant] MTG Properties, LLC ("MTG"), who hired [d]efendant Tara Construction Services, Inc. and its contractor [defendant] James Githens ("Githens") to renovate it for resale. At the time [p]laintiff first saw the house, it was still being renovated and she alleges Githens told her the work would be completed by June 16, 2003. He also indicated if [p]laintiff was interested in purchasing the some, she could be included in choosing the colors.

On April 22, 2003, [p]laintiff entered into a contract to purchase the property. Provisions in the contract included a right to inspect before closing, that the property was being sold "as is"[,] and [that] no oral representations were made by the seller.

On July 16, 2003, [p]laintiff and Githens signed an agreement to have a Punch List of items to be completed at the house. The Punch List was based on a joint inspection of the premises by [p]laintiff and Githens.

July 16, 2003 was also the scheduled closing date; however, the renovations were not completed. Plaintiff visited the house that morning and was aware of the uncompleted work. At the closing, [p]laintiff, Richmond, [defendant] Christopher J. Masso ("Masso"), a representative of MTG, and MTG's real estate agent were present.

Richmond advised [plaintiff] not to close until the repairs were completed, yet [p]laintiff insisted on closing the property on that date. Richmond prepared a legal document for [p]laintiff to sign stating that she was advised not to proceed until the work was completed, that she should seek legal counsel before proceeding, and that [p]laintiff agrees "to hold Weichert Realtors and their representatives harmless from any legal action resulting from [her] decision to proceed."

Richmond recommended that if [p]laintiff was going to close on her house that she should escrow a substantial portion of the purchase price. An Escrow Agreement was negotiated, drafted and signed. The original agreement was for $3,000 until Githens completed the punch list items on or before August 1, 2003, after which time all rights and obligations of the parties would terminate. During the closing, [defendant] Masso visited the property and when he returned he suggested the escrow agreement be increased to $10,000. This change was accepted and handwritten on the face of the Escrow Agreement.

On August 4, 2003, Githens asked [p]laintiff to sign an agreement releasing the $10,000 in escrow money to him. At this time, [p]laintiff and Githens knew the items on the punch list had not been completed. Plaintiff signed the agreement after Githens allegedly represented to her that he needed the money to finish the house and that [defendant] Masso was not paying him. Githens then presented the release with [p]lainitff's signature to [defendant] Masso to sign on behalf of MTG, agreeing to release the escrow money to Githens. [Defendant] Masso was unaware that the work had not been completed. Plaintiff did not tell Masso until 30 days later that the work was not completed.

On January 13, 2004 Githens had still not completed the work. This is when [p]laintiff filed a [c]omplaint.

From those undisputed record facts developed by the parties purportedly in compliance with the obligations imposed by our summary judgment rules, the trial court entered summary judgment in favor of defendants. It primarily concluded that that there was no agency relationship—either express, implied or apparent—between Githens and Tara Construction Services, Inc., on the one side, and defendants, on the other; therefore, defendants could not be liable for the actions of Githens and Tara Construction Services, Inc. either in failing to complete the punch list items or in duping plaintiff out of the escrow funds. It also concluded that none of the defendants breached the real estate

sales contract with plaintiff, particularly as that contract specifically provided that no liability would accrue thereunder after closing on the property had occurred and, more to the point, several of the named defendants were not even parties to the contract. The trial court appeared acutely aware that plaintiff's woes were self-inflicted; it noted that "[p]laintiff went against her real estate agent, Richmond's advice and chose to close on the property anyway. In doing so, [p]laintiff voided any warranties and knowingly accepted the 'as is' property." [3] It further held that defendants had made no misrepresentations to plaintiff; and that plaintiff had presented no cognizable cause of action under the Consumer Fraud Act, *N.J.S.A.* 56:8–2.[4]

Plaintiff sought reconsideration, which was denied on August 3, 2007. Procedurally, the trial court held that plaintiff's motion for reconsideration, having been filed "eight months" after the court had entered its summary judgment decision, was untimely. *R.*

---

[3] Not only did plaintiff settle on the unfinished property despite her realtor's strong opposition thereto—an opposition that ripened into the realtor's insistence that plaintiff hold the realtor and her agency harmless from plaintiff proceeding to closing over the realtor's well-founded objections—plaintiff, without seeking anyone's counsel or advice, also fell prey to one of the oldest scams around: Githens's request that plaintiff release the $10,000 in escrow and hold as "security" Githens's own check for $10,000, a check later shown to be worthless.

[4] No doubt, initially the trial court incorrectly noted, as a general proposition, that "[t]he Consumer Fraud Act does not apply to real estate agents and brokers." Although that conclusion was correct when the Consumer Fraud Act first was adopted, *see L.* 1960, *c.* 39, § 2 (limiting statute's reach to merchandise), it was amended in 1976 to extend its reach to real estate. *L.* 1975, *c.* 294, § 1 (eff. Jan. 16, 1976). That said, the trial court's separate conclusions that the facts do not justify the application of the Consumer Fraud Act to defendants Masso, Torrence, or MTG Properties, LLC, or that, as a matter of law, the Consumer Fraud Act does not apply to defendants Lynch and Prudential Fox & Roach Realtors are unremarkable. *See Macedo v. Dello Russo,* 178 *N.J.* 340, 344–45, 840 *A.2d* 238 (2004); *see also Real v. Radir Wheels, Inc.,* 198 *N.J.* 511, 522–24, 969 *A.2d* 1069 (2009) (describing exceptions to Consumer Fraud Act's reach). The application of the Consumer Fraud Act was raised by plaintiff both on reconsideration and the second reconsideration, and was disposed of then.

4:49–2 ("Except as otherwise provided by *R.* 1:13–1 (clerical errors) a motion for rehearing or reconsideration seeking to alter or amend a judgment or order shall be served not later than 20 days after service of the judgment or order upon all parties by the party obtaining it."). Noting further the limited scope of reconsideration motions, the trial court ruled that "plaintiff's motion for reconsideration must be denied since the plaintiff has not met the elements for reconsideration." It noted:

> The plaintiff seeks reconsideration relying upon "new information" which the plaintiff concedes is "uncovered facts of which were previously overlooked. These facts included the deposition answers provided by Masso and Githens." [providing reference to plaintiff's reply brief in support of reconsideration motion]. The depositions of Masso and Githens were taken two years ago and hardly can be considered new information. The plaintiff has not shown that the Court's reasoning was plainly incorrect. Plaintiff's failure to examine deposition transcripts for the December 1, 2006 summary judgment motion is not the Court's error.

However, after hearing the one-sided evidence plaintiff presented at the uncontested proof hearing against Githens and Tara Construction Services, Inc., the trial court sua sponte reconsidered that decision, asked for more argument from the parties and, based on a new, expanded record that contained no facts that were not readily available to all parties at the time the summary judgment motion was first adjudicated, ultimately vacated the summary judgment it had entered in favor of defendants. Defendants sought interlocutory review and the Appellate Division reversed, ordering that the entry of summary judgment in defendants' favor be reinstated. Once judgment was entered against Githens and Tara Construction Services, Inc., plaintiff appealed and the Appellate Division again reversed, this time concluding that, based on the entire record—that is, the record originally presented by the parties at the initial summary judgment motion as supplemented by the expanded record generated after the proof hearing triggered the trial court's change-of-heart—summary judgment had been improvidently granted to defendants.

## III.

Falling into the same trap the trial court did after the proof hearing against Githens and Tara Constructions Services, Inc.

held eight months after summary judgment had been entered in defendants' favor *and* after plaintiff's motion for reconsideration had been denied, a trap that also ensnared the Appellate Division, the majority imports facts clearly outside the summary judgment record originally framed and generated by the parties, essentially giving plaintiff an undeserved and entirely inappropriate "second bite of the apple." [5] Inserting that level of uncertainty into an already determined summary judgment determination—based solely on a litigant's unexplained failure to put his/her best foot forward in opposing a summary judgment motion and based solely on proofs readily available at the time the motion originally was adjudicated—is both jurisprudentially wrong and needlessly damaging to our system of justice.

Tacitly acknowledging plaintiff's clear obligation to properly respond to defendants' summary judgment motion, the majority concedes—as perforce it must—that the evidence plaintiff tendered at the post-summary judgment proof hearing and at the later reconvened summary judgment hearing was both more robust and more complete than what plaintiff first had offered in opposition to defendants' summary judgment motion. *Ante* at

---

[5] The majority denies it has "looked beyond [the original summary judgment] record," *ante* at 542 n. 9, 25 *A.*3d at 1094 n. 9. That is simply disingenuous; to paraphrase Queen Gertrude, the majority "doth protest too much, methinks." William Shakespeare, *Hamlet* act 3, sc. 2, l. 230. If the basis for today's decision is the *original* summary judgment record, then there is no basis—absolutely none—to upend the judgment originally entered by the trial court on that record. The majority would do well to recall that the only reason the trial court reopened the summary judgment it already had granted was because the expanded record developed in the proof hearing in which defendants were not participants raised questions in the trial court's mind. Stripped bare of its rhetoric, the majority's denial constitutes "a legal sleight-of-hand [that] is nothing more than the exercise of 'the false logic of " '*Post hoc, ergo propter hoc* analysis[.]' " *Schulman v. Male,* 70 *N.J.Super.* 234, 240, 175 *A.*2d 450 (App.Div.1961), and merits no additional response. *See Black's Law Dictionary* 1285 (9th ed. 2009) (translating *'post hoc, ergo propter hoc'* as 'after this, therefore because of this' and defining phrase as '[o]f or relating to the fallacy of assuming causality from temporal sequence; confusing sequence with consequence')". *Ryan v. Renny,* 203 *N.J.* 37, 68 n. 7, 999 *A.*2d 427 (2010) (Rivera–Soto, J., dissenting).

529, 25 *A*.3d at 1086 ("Plaintiff's testimony at the proof hearing was a more detailed version of what was in the summary judgment record. Also, some of the excerpts from Githens' deposition that were submitted were different from those that were provided at the summary judgment phase.").

That concession provides the proper context for this appeal. So framed, the true question this appeal presents is simple: based on plaintiff's unequivocal obligation to oppose properly a summary judgment motion, what did *plaintiff* know, or in the exercise of proper diligence should have known, at that time in order to present her opposition to defendants' motion for summary judgment? Here, summary judgment was reconsidered based on facts that were adduced at a deposition noticed and taken by plaintiff well before defendants' summary judgment motion originally was determined. Plaintiff clearly was charged with timely knowledge thereof, and her failure to adduce those additional "new" facts as part of a timely opposition to defendants' summary judgment motion requires that the consequences of that failure—the entry of summary judgment in favor of defendants—rest squarely at her feet, and nowhere else. It bears repeating: the rules governing summary judgment motions provide but one opportunity to oppose the motion, a precept that stresses that, in doing so, litigants must put their best foot forward. Concededly, plaintiff abjectly failed to do so. The consequences of that failure are hers and hers alone, and, most assuredly, cannot justify upending a properly entered summary judgment secured by the parties who—starkly unlike plaintiff—fully complied with their obligations.

## IV.

There are no shades of gray in this appeal: plaintiff indisputably failed to comply with the most elementary requirements of summary judgment practice, and it is that failure that, in my view, must doom her subsequent efforts. It is, therefore, irrelevant whether we are confronted with "a procedural swamp," *ante* at 522, 25 *A*.3d at 1082, an interlocutory appeal decision that, by an

analogy to a twice-used canvas, "constitutes the pentimento [6] in the case, painted over by other procedures but at the heart of things," *ante* at 533, 25 *A.*3d at 1089, or, for that matter, any other construct that may bloom fully grown from overactive, clever minds. They are, each and every one, nothing more than red herrings. What is and remains singularly relevant and unmistakably dispositive is that every fact—every single, solitary fact— plaintiff adduced to justify vacating the summary judgment rightly earned by defendants was available and known to plaintiff well before she first responded to defendants' summary judgment motion. In that very real and palpable sense, nothing has changed to justify a different outcome. Nothing.

Our *Rules* make abundantly, painstakingly clear that it is the unqualified affirmative burden of adverse parties to make a complete and comprehensive showing why summary judgment should not be entered; a summary judgment motion is not the time to play "hide the ball" or to take chances on just how much one discloses of one's case. Yet, whether by either slovenly inadvertence or pinpointed intent, that is precisely what plaintiff did here, and that is what the majority today wrongfully rewards. Because plaintiff should be bound to the choices she made in either slovenly or intentionally responding to defendants' motion for summary judgment; because the majority's obsession with allowing this ill-starred plaintiff to proceed on her · original claim overwhelms its reason; and because the majority illogically rewards the sloppiness our *Rules* seek to eradicate and, in doing so, in a very real sense punishes the professional diligence our *Rules* are intended to foster, I dissent.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA and ALBIN—4.

---

[6] The term "pentimento" means "[a]n underlying image in a painting, as an earlier painting, part of a painting, or original draft, that shows through, usu[ally] when the top layer of paint has become transparent with age." *Webster's II New College Dictionary* 814 (1995).

*For reversal*—Justice RIVERA–SOTO—1.

*Not Participating*—Justice HOENS.